IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| **NORMAN UNDERSTEIN AND JILL PARRECO**<br>8757 Georgia Avenue, Suite 1330<br>Silver Spring, Maryland 20910<br><br>    Plaintiffs<br><br>    v.<br><br>**ONCONOME, INC.**<br>15385 NE 90th Street<br>Redmond, Washington 98052<br><br>    Serve: Randall Brock, Registered Agent<br>    15385 NE 90th Street<br>    Redmond, Washington 98052<br><br>    and<br><br>**H. RAY CAIRNCROSS**<br>201 Elliott Avenue West<br>Seattle, Washington 98119-4240<br><br>    and<br><br>**JAY HAGENBUCH**<br>13306 Highway 75<br>Ketchum , Idaho 83340<br><br>    and<br><br>**KEN KELLER**<br>221 1st Avenue W. Suite 108<br>Seattle, Washington 98119<br><br>    and<br><br>**J. CARTER MCNABB**<br>c/o River Cities Capital Funds<br>221 East Fourth Street, Suite 2400<br>Cincinnati, Ohio 45202-4151<br><br>    and | Case No. _JY-C-09 005-565_<br>Complaint and Jury Demand<br><br><br>FILED<br><br>AUG 28 2009<br><br>CIVIL DIV.<br>CIRCUIT COURT FOR<br>BALTIMORE CITY |

GREGORY DEMOPULOS                         *
4845 Forest Avenue South East             *
Mercer Island, Washington 98040           *
                                          *
          and                             *
                                          *
RANDALL BROCK                             *
15385 NE 90th Street                      *
Redmond Washington 98052                  *
                                          *
          Defendants                      *

## COMPLAINT

Plaintiffs, Norman Understein and Jill Parreco, husband and wife, sue Defendants,

Onconome, Inc., H. Ray Cairncross, Jay Hagenbuch, Ken Keller, J. Carter McNabb, Gregory

Demopulos and Randall Brock.

### I. The Parties

1.      At all times relevant to this action Plaintiffs were husband and wife residing in

Montgomery County, Maryland.

2.      At all times relevant to this action Defendant Onconome, Inc. was a corporation

formed under the laws of the state of Washington, conducting business in Maryland.

3.      At all times relevant to this action Defendant Ray Cairncross was an individual

residing in the state of Washington, serving as a director of Defendant Onconome, Inc.

4.      At all times relevant to this action Defendant Jay Hagenbuch was an individual

residing in the state of Idaho, serving as a director of Defendant Onconome, Inc.

5.      At all times relevant to this action Defendant Ken Keller was an individual

residing in the state of Washington, serving as a director of Defendant Onconome, Inc.

6.      At all times relevant to this action Defendant J. Carter McNabb was an individual residing in the state of Ohio, serving as a director of Defendant Onconome, Inc.

7.      At all times relevant to this action Defendant Gregory Demopulos was an individual residing in the state of Washington, serving as a director of Defendant Onconome, Inc.

8.      At all times relevant to this action Randall Brock was an individual residing in a the state of Washington and served as a director of Defendant Onconome, Inc.

## II.  Jurisdiction and Venue

9.      Onconome has filed suit in this Court in Case No. 24 CO 9001310 arising from some of the same facts that give rise to this suit.  By that suit, Onconome has submitted itself to personal jurisdiction in this Court.

10.     This Court also has personal jurisdiction over Onconome under Md. Code Ann., Cts. & Judicial Proc., § 6-103(b)(1), (2), (3) and (4) because Onconome has directly and through agents transacted business in Baltimore and elsewhere in Maryland, contracted to supply services in Baltimore and elsewhere in Maryland, caused tortious injury in Maryland, regularly conducted or solicited business in Maryland, and engaged in a persistent course of conduct in Maryland.

11.     Venue is proper in this Court under Md. Code Ann., Cts. & Judicial Proc. § 6-201.

## III.  Allegations of Fact

12.     In 2002, Onconome began research on a new method of detecting prostate cancer ("the Project").  Its partners in this research were Robert H. Getzenberg, Ph.D., a Maryland resident; Johns Hopkins University, a Maryland corporation; and the University of Pittsburgh, a Pennsylvania corporation.  Dr. Getzenberg, who is not a physician, conducted research studies

3

that purportedly resulted in revolutionary new findings, which were publicized by Onconome to generate financial support for the Project.

13.     Onconome relied almost entirely on the Project for its financial future.  The success of the Project relied almost entirely on the accuracy of Dr. Getzenberg's findings.  However, as early as October, 2006 Onconome knew that Dr. Getzenberg's findings were seriously flawed and would not support the Project.  To maintain its existence, Onconome nevertheless continued to raise capital from new investors including Plaintiffs.

14.     In its own complaint filed in Onconome v. University of Pittsburgh, CCBC Case No. 24C09001310, Onconome alleges:

> 68.  During the summer and into the fall of 2006 Dr. Getzenberg continued to offer various excuses for his refusal to run the Kyowa Medex samples.  He likewise refused to run the samples that Roche Diagnostics proposed to send, which was a precondition of Roche Diagnostics entering into a binding license agreement.
>
> 69.  In October 2006, scientists at Onconome independently tried to replicate Dr. Getzenberg's prior, reported research results.  Onconome's tests were not successful. . .

Thus, Onconome knew as early as October of 2006 that Dr. Getzenberg's research was seriously flawed.

15.     In June of 2007 Plaintiffs inquired of Onconome about investing, and received from Onconome a printed report dated May, 2007 entitled, "Business Description," (excerpts attached as Exhibit 1) containing a glowing report on the Project, stating in part:

> . . .
>
> 2. Onconome, Inc. (the "Company") has exclusive, worldwide rights to a blood test for prostate cancer which large research studies at Johns Hopkins University (JHU) have shown to exhibit **extraordinary**

**performance characteristics**. Addendum E, a reprint of the recently published article in Urology, describes the test and its **enormous potential for the early and accurate detection of prostate cancer**. . . .

5. The JHU research studies show that the Company's licensed technology, called EPCA-2, has much higher sensitivity (94%) and specificity (97%) than PSA and **over time should become the new standard for prostate cancer testing globally**.

6. EPCA-2 was discovered by Robert Getzenberg, PhD . . . The Company provides financial support to Dr. Getzenberg's laboratory at JHU in exchange for development of new technology. Dr. Getzenberg is Chairman of the Company's Scientific Advisory Board and also consults with the Company on an ongoing basis. . . .

Id. at 2.

PRODUCTS AND SERVICES

. . . Onconome holds exclusive, worldwide licenses to the EPCA-2, CCSA-4 and EPCA IHC markers . . . The Company is focused on the development and optimization of its **two lead serum markers** (EPCA-2 and CCSA-4) as well as its EPCA-IHC tissue test for use on negative prostate biopsies for these two critical disease conditions in order to meet the significant, unmet, **international demand for early detection cancer diagnostics**. . . . The details of this work have just been published in the peer-reviewed journal UROLOGY®. A reprint is included as Addendum E. . . .

EPCA-2: **The Company estimates that in its first full year of sales in 2010 it will capture 10% of the target market of 29.5 million men in the US aged 50 to 79. In 2011, that market share is estimated to grow to 25%**. Initially, the Company would expect to receive approximately $20 per test . . .

Id. at 4.

Exhibit 1, attached. [Emphasis added.]

16.    The May, 2007 Business Description was misleading and deceptively optimistic

in failing to disclose the flaws in Dr. Getzenberg's research already known to Onconome. It also failed to disclose that the article reporting the purported results of Dr. Getzenberg's research in Urology, a medical journal published overseas, had been rejected by other more prestigious medical journals, including the Journal of the American Medical Association (JAMA) and the New England Journal of Medicine, for failure to satisfy research protocol standards.

17.    In addition to his positions as Chair of Onconome's Scientific Advisory Board and ongoing consultant, Dr. Getzenberg had a beneficial stake in Onconome's financial future through his wife's ownership of stock in Onconome.

18.    Dr. Getzenberg's research related to the Project was conducted without independent supervision or review. He was given essentially free reign to conduct Onconome-funded research to conduct the Project, the success of which would potentially generate investor interest, increased stock value, and thus, financial benefit for stockholders.

19.    Defendants are sophisticated scientists, medical professionals, investors and managers of bio-tech companies. At all times relevant to this action they are aware of the conflict of interest that can arise when essential research results in negative findings. Despite this potential conflict, Defendants failed to install any mechanism for concurrent oversight of Dr. Getzenberg's research, or for prompt verification of outcomes, in connection with the Project.

20.    On July 12, 2007 Randall Brock of Onconome sent an email to Mr. Understein enclosing certain information and referring him to the Business Description. A copy of that email is attached as Exhibit 2. Mr. Brock was silent as to any irregularities in the Project or any flaws in the underlying research.

21.    In reliance on the information in the May, 2007 Business Description, and

6

Onconome's silence as to any material flaws in the Project, on July 23, 2007 Mr. Understein, for himself and his wife, sent Onconome personal a check in the amount of $100,000 drawn on a joint account in the names of Norman Understein and his wife, Jill Parreco, to purchase shares of Series C preferred stock in Onconome.  Plaintiffs later received a stock certificate from Onconome as evidence of their ownership of shares.  A copy of the check is attached as Exhibit 3.  A copy of the stock certificate is attached as Exhibit 4.

22.      In a Business Description dated August, 2007 (excerpts attached as Exhibit 5), Onconome optimistically stated:

> The Company's serum and tissue tests for early detection of prostate and colon cancer have demonstrated remarkable specificity and sensitivity in research studies at Johns Hopkins University and the University of Pittsburgh.

Id. at 4.  It stated further,

> Technology Development.
>      As indicated, the published results from EPCA-2 and CCSA-4 research studies performed at both Johns Hopkins University and the University of Pittsburgh, under the direction of Robert Getzenberg, Ph.D., are impressive. The Company is enthusiastic about these data and the potential for successful product development of sensitive and specific serum markers for both prostate and colon cancer. The published results from the EPCA IHC prostate cancer tissue test are significant and encouraging as well. However, we must temper this enthusiasm with an understanding of the current state of development.
>
>      What has been accomplished to date is a proof of principle that these markers appear to be highly specific for prostate and colon cancer, and may differentiate between organ and non-organ confined cancer in the prostate, which is extremely important. The data produced by Dr. Getzenberg and his colleagues at Johns Hopkins resulted from their development and use of a polyclonal antibody based indirect ELISA serum assay. This immunoassay procedure is a laboratory research method and not an assay format that can be adapted for the robust commercial products we are working to develop. The product development process will involve (a) characterizing the proteins found in the original discovery research, (b) developing antibodies to fully sequenced EPCA-2, CCSA-4 and

EPCA IHC proteins or fragments of the proteins which show specific reactivity, (c) developing robust immunoassays that will meet the performance characteristics and manufacturing specifications required for commercialization, and (d) verifying that the assay consistently produces highly specific and sensitive results through extensive testing using well characterized serum samples, so that the final product can be taken through clinical trials successfully and then introduced into the marketplace for clinical use in the U.S., Japan, Europe and other global markets.

Using this model, the Company manages to preserve working capital by maintaining a relatively low burn rate. Throughout the development phase, the Company continues to work with Dr. Getzenberg as well.

Id. at 9. It states further:

. . . In the Company's view, the performance of these first monoclonal "inhibition" assays has not yet met the requirements necessary for commercialization in that there is too much nonspecific reactivity seen in the assay results. Therefore, the Company has broadened its development efforts to include identification of the full proteins, or a larger portion of them, in order to develop assays that will meet the commercialization requirements. Simultaneously, Dr. Getzenberg's lab at Johns Hopkins is working to perfect the performance of the first monoclonal inhibition assays pursuant to the terms of the Corporate Research Agreement between the Company and Johns Hopkins supporting Dr. Getzenberg's work.

Id. at 10.

Exhibit 5, attached.

23.    The August report demonstrated that Defendants knew enough to inform the shareholders that the research did not support the Project. They nevertheless chose to place a positive spin on the information. This report conveyed that Defendants were convinced that the "commercialization requirements" would be met, that the issue was simply a matter of 'perfecting' something that was almost perfect, and that Dr. Getzenberg was still fully on board.

24.    The August, 2007 report states further:

As we identify the full proteins or more of the proteins, the Company will develop

8

antibodies and begin the process of developing and validating immunoassays for clinical trials. During this process, it is possible that proteins other than those discovered by Dr. Getzenberg will be identified as potential biomarker candidates. In such cases, the Company will evaluate the potential of any new biomarkers for commercial development as well.

Id. at 10.

This language implies that Onconome planned to find new, even better results than Dr. Getzenberg's marker, remaining very optimistic in tone. Rather than disclose the bad news, Onconome attempted to "whitewash" it to maintain investor interest.

25.     The plain meaning of this statement was encouraging, and failed to convey the devastating news that Dr. Getzenberg's data could not be replicated, and that it was apparently falsified. The report also failed to convey that Dr. Getzenberg had essentially been given free reign, and that Onconome chose to rely on his reputation and credibility rather than objective oversight to save money at a "low burn rate." Onconome failed to withdraw its prior characterization of the test results as "amazing," and described the progress as "impressive" and the company's own view as "enthusiastic."

26.     In December, 2007 Onconome issued a "SERIES C PREFERRED STOCK PURCHASE AGREEMENT" intended to be relied upon by purchasers of its Series C preferred stock. That Agreement contained the following language:

> 2.11     Disclosure.  The Company has made available to the Purchasers **all the information reasonably available to the Company** that the Purchasers have requested for deciding whether to acquire the Stock **and all information that the Company believes is reasonably necessary to enable the Purchasers to make such a decision.  No representation or warranty of the Company** contained in this Agreement and the exhibits attached hereto, any certificate furnished or to be furnished to Purchasers at the Closing, **contains any untrue statement of a material fact or omits to state a material fact** necessary in order to make the

statements contained herein or therein not misleading in light of the circumstances under which they were made. **The financial and other projections provided to Purchasers were prepared in good faith**; however, the Company does not warrant that it will achieve such projections.

27.     The Stock Purchase Agreement quoted above contained falsehoods as follows: The Company failed to "make available to the Purchasers all the information reasonably available to the Company that the Purchasers have requested for deciding whether to acquire the Stock" by failing to disclose that it was aware as early as October of 2006 of the critical flaws in Dr. Getzenberg's research, while entertaining Plaintiffs as purchasers of Series C Preferred stock.

28.     Onconome also failed to disclose "all information that the Company believes is reasonably necessary to enable the Purchasers to make such a decision." Onconome, managed by sophisticated medical science professionals, knew that the failed tests were "information . . . reasonably necessary to enable the Purchasers to make such a decision," yet failed to disclose this information while allowing Plaintiffs to believe that the research was showing nothing but optimistic results.

29.     The statement that "No representation or warranty of the Company contained in this Agreement and the exhibits attached . . . contains any untrue statement of a material fact or omits to state a material fact . . ." was untrue. Material facts were omitted and misstated as alleged herein.

30.     In conducting the Project, Onconome failed to apply proper protocol review and scrubbing, failed to set up proper test design, failed to employ and supervise internal data monitors and research coordinators in a proper fashion, failed to engage and rely upon external data monitors and research coordinators, and failed to rely upon independent biostatisticians.

Onconome failed to maintain objectivity, and instead relied on informal and unverified reports

from Dr. Getzenberg and persons under his direction, on the progress of the research and testing.

Onconome failed to meet industry standards in each of these categories.  At all relevant times,

Onconome was aware that it was deviating from industry standards in each of these categories.

31.    In a Shareholder Update dated February 5, 2009, Onconome finally disclosed to

its investors the truthful negative information about the Getzenberg "discoveries"[1] as follows:

> JHU, Pitt and Getzenberg Update.
>
> . . . Dr. Getzenberg's exceptional results in both prostate and colon cancer testing
> could not be reproduced using his "discoveries" and assay methods. As a result,
> we began a focused program in our labs and in collaboration with third parties to
> isolate fully sequenced proteins using mass spec and other methods to select
> promising candidates for early detection of both prostate and colon cancer. As the
> foregoing discussion indicates, we have made encouraging progress in this area
> and hopefully will continue to do so. . . . [W]e have concluded that his data is
> neither complete nor reliable. As a consequence, we are seeking restitution and
> damages . . . Enclosed with this letter is a copy of the complaint we have filed in
> Baltimore setting out the basis for our claims. . . . In the meantime and in order to
> make the best use of our resources we have scaled back the Company significantly
> . . . If we are successful in this effort, either by way of settlement or completion of
> the litigation process, the Board and the Shareholders will determine our next
> steps. In the meantime, we will keep you advised of material events as they arise.

Exhibit 6, attached.

32.    In February, 2009 Mr. Understein read Exhibit 6 and the "complaint" referenced

therein (the complaint in <u>Onconome v. University of Pittsburgh</u>, CCBC Case No. 24C09001310).

Mr. Understein was shocked to learn that Onconome had known as early as October, 2006 of the

serious flaws in Dr. Getzenberg's research, and the non-replicable nature of his purported

---

[1] By placing the word, "discoveries" in quotes, Onconome clearly created a sudden
departure from its more sanguine statements in the August, 2007 report, now attempting to
separate itself from Dr. Getzenberg.

outcomes. This was the first time Mr. Understein was aware that Onconome had concealed, or failed to disclose, the fact of its awareness of these flaws, while it was accepting his investment.

33.     The flaws in Dr. Getzenberg's research were material and substantial in nature because they undermined the integrity of the entire Project, on which the financial future of Onconome rested. If the research findings were not valid, the company and its stock had little value.

34.     Onconome held the Plaintiffs' check and did not negotiate it until September, 2007. During that interval Onconome had additional opportunity to notify Plaintiffs of the irregularities in the Project, and to give them an opportunity to rescind their investment, but chose not to do so. However, Onconome continued in its failure to disclose to Plaintiffs the falsity of the research findings.

35.     In deciding to purchase shares of stock in Onconome, Plaintiffs relied on representations by Onconome that the Project was moving along successfully, that Dr. Getzenberg's early test results showing dramatic new progress had been confirmed, and that the new prostate test was developing in a positive direction. The specific information as to the flaws in Dr. Getzenberg's research that were known to Onconome included the following:

36.     Plaintiffs, both individually and jointly in reliance on information reviewed by each of them, relied upon the printed materials they received from Onconome in the reasonable belief that those materials were truthful and accurate, that Onconome had legitimate optimistic expectations for the development of the Project, and that there were no material, negative facts known to Onconome that would have weighed against investment in the Project. Plaintiff Jill Parreco relied on the information in these reports, either directly or as conveyed to her by her

12

husband.

37.    Onconome lost objectivity, skimped on costs by not using its highly trained and specialized experts, or any neutral consultant, to check on the validity of Dr. Getzenberg's work. Onconome continued to pour its money, and its chairman's money, into this project, desperately wishing for success without employing objective criteria.  None of its other projects promised such dramatic results as had been promoted for the Project.

38.    The Corporations and Associations Article of the Annotated Code of Maryland provides in relevant part as follows:

§ 11-703 Civil liabilities

(a) When seller, purchaser or advisor liable.-
    (1) A person is civilly liable to the person buying a security from him if he:
        (i) Offers or sells the security in violation of § 11-304(b), § 11-401(a), § 11-402(a), or § 11-501 of this title, or of any rule or order under § 11-205 of this title which requires the affirmative approval of sales literature before it is used; or
        (ii) Offers or sells the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and if he does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. . . .

(b) Extent of liability.-
    (1) A buyer may sue either at law or in equity:
        (i) On tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security; or
        (ii) If he no longer owns the security, for damages.
    (2) A seller may sue either at law or in equity:

(i) On tender of the consideration paid for the security, to recover the security, together with the amount of any income received on the security, costs, and reasonable attorneys' fees; or
(ii) If the buyer no longer owns the security, for damages.
(3) For the purposes of subsection (b)(1)(ii) of this section, damages are the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition.
(4) (i) In any action brought under subsection (a)(3) of this section a person may sue either at law or in equity for the rescission of the advisory contract and any damages resulting from the violation, together with interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of payment of the consideration, costs, and reasonable attorneys' fees, less the amount of any income received from such advice.
(ii) An action based on a violation of § 11-302(c) of this title may not prevail where the person accused of the violation sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(c) Others jointly and severally liable with seller or purchaser.-
(1) Every person who directly or indirectly controls a person liable under subsection (a) of this section, every partner, officer, or director of the person liable, every person occupying a similar status or performing similar functions, every employee of the person liable who materially aids in the conduct giving rise to the liability, and every broker-dealer or agent who materially aids in such conduct are also liable jointly and severally with and to the same extent as the person liable, unless able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
(2) There is contribution as in cases of contract among the several persons so liable.

(d) Time of making tender.- Any tender specified in this section may be made at any time before entry of judgment. . . .

(f) Limitation of actions; effect of offer of refund.-
(1) A person may not sue under subsections (a)(1) and (2) of this section after the earlier to occur of 3 years after the contract of sale or purchase or the time specified in paragraph (2) of this subsection.
(2) An action may not be maintained: . . . .
(ii) To enforce any liability created under subsection (a)(1)(ii) or (2) of this

section, unless brought within one year after the discovery of the untrue statement or omission, or after the discovery should have been made by the exercise of reasonable diligence. . . .

39.      Each of the individual defendants, H. Ray Cairncross, Jay Hagenbuch, Ken Keller, J. Carter McNabb, Gregory Demopulos and Randall Brock, participated in, authorized, condoned and ratified each of the acts alleged above.  On or before each of the dates of issuance of the business Descriptions and Shareholder Updates issued by Onconome, each of the individual defendants participated in a meeting or expressed their authorization of the statements and representations made in those publications.  Each of the individual defendants elected to accept investor funds for Series C Preferred Stock in Onconome without informing the investors of the serious flaws in the underlying research related to the Project, although these defendants were aware of the significance of these flaws.  All of the actions alleged above were undertaken by the individual defendants or by persons acting as their agents.

40.      Each of the individual defendants, H. Ray Cairncross, Jay Hagenbuch, Ken Keller, J. Carter McNabb, Gregory Demopulos and Randall Brock, was a person who directly or indirectly controled a person liable under subsection (a) of the Maryland statute, and was a partner, officer, or director of Onconome, and materially aided in the conduct giving rise to the liability alleged in this suit.  Each of the individual defendants are therefore liable jointly and severally with and to the same extent as each of the other defendants including Onconome.  Plaintiffs did not know, and in the exercise of reasonable care could not have known, of the fact that Defendants knew of the flawed research while they accepted Plaintiffs' investment funds.

## COUNT I - FRAUD

41.     The allegations above are hereby incorporated by reference.

42.     In October, 2006 Defendants knew that the research on which the Project was built was seriously flawed.  In June, 2007 Defendants provided Plaintiffs with a business Description that painted a falsely optimistic picture of the Project, stating that it had "enormous potential" and would create a "new standard" for prostate cancer detection.  Defendants failed to disclose to Plaintiffs that they knew of the serious flaws in the underlying research, and consciously chose to remain silent and to refrain from communicating this critical information to Plaintiffs.  Defendants had additional time after Plaintiffs check was delivered, as they held it and did not negotiate it until three months after it was written.  Their silence continued while they held Plaintiffs' check, and continued further until February, 2009.  Defendants failed to disclose that they knew as of October, 2006 of the flaws in the research, until February, 2009 when shareholders were provided with a copy of the new civil complaint filed by Onconome in this Court.

43.     Plaintiffs reasonably relied on the May 2007 Business Description and Defendants' silence as to any material flaws in the research.  As a direct and proximate result of this reasonable reliance on Defendants' deception and concealment as alleged above, Plaintiffs suffered loss in the form of serious diminution, if not complete elimination, of the value of their investment.

## COUNT II - NEGLIGENT CONCEALMENT

44.     The allegations above are hereby incorporated by reference.

45.     At all times relevant to this action Defendants had the duty to disclose, and not to

conceal, all material information regarding the Project that might bear on Plaintiffs' investment.

46.     In October, 2006 Defendants knew that the research on which the Project was built was seriously flawed.  In June, 2007 Defendants provided Plaintiffs with a business Description that painted a falsely optimistic picture of the Project, stating that it had "enormous potential" and would create a "new standard" for prostate cancer detection.  Defendants carelessly and recklessly concealed and failed to disclose to Plaintiffs that they knew of the serious flaws in the underlying research, and carelessly remained silent and failed to communicate this critical information to Plaintiffs.   This silence continued while Defendants held Plaintiffs' check, and continued further until February, 2009.  Defendants failed to disclose that they knew as of October, 2006 of the flaws in the research, until February, 2009 when shareholders were provided with a copy of the new civil complaint filed by Onconome in this Court.

47.     Plaintiffs reasonably relied on the May 2007 Business Description and Defendants' silence as to any material flaws in the research.  As a direct and proximate result of this reasonable reliance on  Defendants' careless concealment and failure to disclose as alleged above, Plaintiffs suffered loss in the form of serious diminution, if not complete elimination, of the value of their investment.

## COUNT III - NEGLIGENT MISREPRESENTATION

48.     The allegations above are hereby incorporated by reference.

49.     At all times relevant to this action Defendants had the duty to disclose, and not to conceal, all material information regarding the Project that might bear on Plaintiffs' investment.

50.     In October, 2006 Defendants knew that the research on which the Project was

built was seriously flawed.  In June, 2007 Defendants provided Plaintiffs with a business
Description that carelessly painted a falsely optimistic picture of the Project, stating that it had
"enormous potential" and would create a "new standard" for prostate cancer detection.
Defendants carelessly and recklessly failed to disclose to Plaintiffs that they knew of the serious
flaws in the underlying research, and carelessly remained silent and failed to communicate this
critical information to Plaintiffs.  This silence continued while Defendants held Plaintiffs' check,
and continued further until February, 2009.  Defendants carelessly failed to disclose that they
knew as of October, 2006 of the flaws in the research, until February, 2009 when shareholders
were provided with a copy of the new civil complaint filed by Onconome in this Court.

51.     Plaintiffs reasonably relied on the May 2007 Business Description and
Defendants' silence as to any material flaws in the research.  As a direct and proximate result of
this reasonable reliance on Defendants' careless concealment and failure to disclose as alleged
above, Plaintiffs suffered loss in the form of serious diminution, if not complete elimination, of
the value of their investment.

### COUNT IV - CONSPIRACY

52.     The allegations above are hereby incorporated by reference.

53.     In October, 2006 Defendants knew that the research on which the Project was
built was seriously flawed.  They reached agreement and took action in furtherance thereof as
follows: They conferred on several occasions during 2006 and 2007, including May, 2007 and
the dates on which each Shareholder Update and Business Description was published, or shortly
before those dates, and agreed not to disclose to shareholders the fact that serious flaws in Dr.
Getzenberg's research and findings had been detected.  Further to this agreement, they concealed

this information from the shareholders, until finally disclosing it in February, 2009.

54.     Plaintiffs reasonably relied on the May 2007 Business Description and Defendants' silence as to any material flaws in the research.  As a direct and proximate result of this reasonable reliance on Defendants' concealment and failure to disclose as alleged above, Plaintiffs suffered loss in the form of serious diminution, if not complete elimination, of the value of their investment.

### COUNT V - MARYLAND SECURITIES ACT

55.     The allegations above are hereby incorporated by reference.

56.     In October, 2006 Defendants knew that the research on which the Project was built was seriously flawed.  In June, 2007 Defendants provided Plaintiffs with a business Description that painted a falsely optimistic picture of the Project, stating that it had "enormous potential" and would create a "new standard" for prostate cancer detection.  Defendants failed to disclose to Plaintiffs that they knew of the serious flaws in the underlying research, and consciously chose to remain silent and to refrain from communicating this critical information to Plaintiffs.  Defendants had additional time after Plaintiffs check was delivered, as they held it and did not negotiate it until three months after it was written.  Their silence continued while they held Plaintiffs' check, and continued further until February, 2009.  Defendants failed to disclose that they knew as of October, 2006 of the flaws in the research, until February, 2009 when shareholders were provided with a copy of the new civil complaint filed by Onconome in this Court.

57.     Plaintiffs reasonably relied on the May 2007 Business Description and Defendants' silence as to any material flaws in the research.  As a direct and proximate result of

this reasonable reliance on Defendants' deception and concealment as alleged above, Plaintiffs suffered loss in the form of serious diminution, if not complete elimination, of the value of their investment.

58.     Defendants' conduct as alleged herein is in violation of §11-703(a)(1)(ii) of the Corporations and Associations Article of the Annotated Code of Maryland, which imposes liability on a person who " Offers or sells the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission . . ."

**RELIEF SOUGHT**

Plaintiffs, Norman Understein and Jill Parreco, seek judgment against Defendants Onconome, Inc., H. Ray Cairncross, Jay Hagenbuch, Ken Keller, J. Carter McNabb, Gregory Demopulos and Randall Brock, jointly and severally, in the amount of $100,000 compensatory damages, plus attorneys' fees, interest, costs, all relief affordable under §11-703 of the Corporations and Associations Article of the Annotated Code of Maryland, and such other relief as may be appropriate.

STEPHEN H. RING, P.C., by


Stephen H. Ring
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
Md. Court of Appeals No. 04731764
Telephone: 301-563-9249
Facsimile: 301-563-9639
shr@ringlaw.us
Attorney for Plaintiffs

### Jury Demand

Plaintiffs request a trial by jury as to all claims so triable.


Stephen H. Ring

### Exhibits to Complaint

1    Business Description, May, 2007 (excerpts)

2    Email, July 12, 2007, from Randall Brock of Onconome to Norman Understein

3    Check for $100,000 from Plaintiffs to Onconome;

4    Stock certificate

5    Business Description, August, 2007 (excerpts)

6    Shareholder Update, February 5, 2009 (excerpts)

21